## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION
_____

Zainab Hakim; Henry MacKeen-Shapiro;
Eaman Ali; Assmaa Eidy, Harrison Rhoades,
Arwa Hassaballa; Rhea Chappell; and
Zaynab Elkolaly;

                       Plaintiffs,

v.

Regents of the University of
Michigan;
Santa Ono, individually and
and as President of the University
of Michigan;
Geoffrey Chatas, individually and
as Executive Vice President and
Chief Financial Officer of the
University of Michigan;
Richard S. Holcomb, Jr.,
individually and as Associate Vice
President for Human Resources of
the University of Michigan; Amy Grier,
individually and as Associate Director
Staff Hauman Resources of the University
of Michigan;


                       Defendants.

Case No. 5:25-cv-11265
Hon. _____

**COMPLAINT &
JURY DEMAND**

_____/

| | |
|---|---|
| John C. Philo (P52721) | Christopher Godshall-Bennett* |
| Liz Jacob (P86981) | AMERICAN-ARAB ANTI- |
| Anthony D. Paris (P71525) | DISCRIMINATION COMMITTEE |
| SUGAR LAW CENTER | 910 17th St. NW, Suite 1000 |
| FOR ECONOMIC | Washington, DC 20006 |

& SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
tparis@sugarlaw.org
**Attorneys for Plaintiffs**

(202) 465-4247/Fax: (202) 333-6470
cgb@adc.org
*Admission to the Eastern District of
Michigan Pending*

Ezra Ritchin
367 St. Marks Ave, #1132
Brooklyn, NY 11238
(917) 725-0116
ritchinezra@gmail.com
**Attorney for Plaintiffs**

_____/

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, ZAINAB HAKIM; HENRY MACKEEN-SHAPIRO; EAMAN ALI; ASSMAA EIDY; HARRISON RHOADES; ARWA HASSABALLA; RHEA CHAPPELL; and ZAYNAB ELKOLALY by and through their attorneys, the SUGAR LAW CENTER FOR ECONOMIC & SOCIAL JUSTICE, the AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE (ADC), and attorney EZRA RITCHIN and for their Complaint against the Defendants do hereby allege as follows:

## I.   NATURE OF PLAINTIFFS' CLAIMS

1.    This is a federal civil rights claim brought pursuant to 42 USC § 1983 for Defendants' violations of the Plaintiffs' rights under the First Amendment to the

2

United States Constitution.

2.      This lawsuit arises from Defendants' violations of free speech, right to petition, and freedom of assembly rights by taking retaliatory and adverse employment actions against Plaintiffs based on speech and activities outside the scope of their employment, including speech relating to issues of significant interest to the University of Michigan ("University") community and to the public at large; association with others with similar viewpoints; and petitioning the University to change its policies and practices.

3.      This lawsuit further arises from Defendants' violations of due process rights when taking the retaliatory and adverse employment actions that deprived Plaintiffs of property interests in their employment and liberty interests in their First Amendment rights.

4.      The Defendants acted against the Plaintiffs because of their advocacy for the human rights of Palestinians to help stop the genocide against the Palestinian people and their calls for the University to divest from Israel and from companies complicit in violating the human rights of Palestinians.

5.      Specifically, Defendants violated Plaintiffs' rights by conduct including but not limited to the following:

- terminating Plaintiffs' employment with the University of Michigan and barring the Plaintiffs from future employment within the entire university system;

- wrongfully stating that Plaintiffs violated the University's Standard Practice Guide 601.18 Violence in the University Community Policy and thereby putting an indelible stain on their employment record; and

- failing to provide proper notice, a fair opportunity to be heard, fair procedures, and an impartial decision maker before or after Plaintiffs' were terminated from their employment.

6.      Each of these actions were taken and based, in whole or part, on speech and activities — occurring outside Plaintiffs' work hours and unrelated to their work responsibilities — to advocate for the human rights of Palestinians, to call for an end to the genocide against the Palestinian people, and to petition their public University to divest from Israel and from companies complicit in violating the human rights of Palestinians.

## II.    JURISDICTION AND VENUE

7.      This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 (federal question). Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 57.

8.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), since a substantial part of the events or omissions giving rise to the claim occurred in this district and multiple Defendants reside in this district.

## III.    PARTIES

9.      Plaintiff ZAINAB HAKIM ("HAKIM") is and was, at all times

4

relevant, a resident of the City of Canton, County of Wayne, State of Michigan. She is an August 2024 graduate of the University of Michigan and was a full-time employee of the University of Michigan.

10.    Plaintiff HENRY MACKEEN-SHAPIRO ("MACKEEN-SHAPIRO") is and was, at all times relevant, a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan. He is an undergraduate student at the University of Michigan and was an employee of the University of Michigan.

11.    Plaintiff EAMAN ALI ("ALI") is and was, at all times relevant, a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan. She is an undergraduate student at the University of Michigan and was an employee of the University of Michigan.

12.    Plaintiff ASSMAA EIDY ("EIDY") is and was, at all times relevant, a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan. She is an undergraduate student at the University of Michigan and was an employee of the University of Michigan.

13.    Plaintiff HARRISON RHOADES ("RHOADES") is and was, at all times relevant, a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan. He is a December 2024 graduate of the University of Michigan and was an employee of the University of Michigan.

14.     Plaintiff ARWA HASSABALLA ("HASSABALLA") is a resident of the Village of Lake Orion, County of Oakland, State of Michigan. She is a December 2023 graduate of the University of Michigan and was an employee of the University of Michigan.

15.     Plaintiff RHEA CHAPPELL ("CHAPPELL") is and was, at all times relevant, a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan. She is an undergraduate student at the University of Michigan and was an employee of the University of Michigan.

16.     Plaintiff ZAYNAB OMAR IBN AL-KHATTAB ELKOLALY ("ELKOLALY ") is and was, at all times relevant, a resident of the City of Ypsilanti, County of Washtenaw, State of Michigan. She is an August 2024 graduate of the University of Michigan and was an employee of the University of Michigan.

17.     Defendant REGENTS OF THE UNIVERSITY OF MICHIGAN ("REGENTS") is a body corporate with its principal place of business in the City of Ann Arbor, Michigan, County of Washtenaw, State of Michigan. Defendant REGENTS have general supervisory powers over the University of Michigan and its officers and control and direct all the institution's expenditures. The REGENTS have the power to set, amend, and enforce university policy and to ensure that the universities policies are observed by all university officials and other employees of the University.

6

18.    Defendant SANTA ONO ("ONO") is and was, at all times relevant, a resident of the City of West Bloomfield, County of Oakland, State of Michigan, and is employed by the University of Michigan, Ann Arbor as the school's President. Defendant ONO's duties and functions include general oversight powers inherent as chief executive of the University, including but not limited to oversight of all University vice presidents, oversight of all staff and contractors, and maintaining order and the welfare of students. He has the power to set, amend, and enforce university policy and to ensure that the universities policies are observed by all university officials and other employees of the University. He is sued in his individual and official capacities.

19.    Defendant GEOFFREY S. CHATAS ("CHATAS") is, and was at all relevant times, the Executive Vice President and Chief Financial Officer at the University of Michigan. Defendant CHATAS oversees human resources and related services.  Defendant CHATAS'S duties and functions include oversight powers of employment actions, including employee grievances. He has the power to set, amend, and enforce university policy as it relates to human resources and to ensure that the universities policies are observed by all subordinate employees and human resources staff. He is sued in his individual and official capacities.

20.    Defendant RICHARD S. HOLCOMB, JR. ("HOLCOMB") is and was, at all times relevant, employed by the University of Michigan as the Associate Vice

President for Human Resources of the University of Michigan. Defendant HOLCOMB oversees the university's human resources office, and his duties and functions include oversight powers of employment actions, including employee grievances. He has the power to set, amend, and enforce university policy as it relates to human resources and to ensure that the universities policies are observed by all subordinate employees and human resources staff. He is sued in his individual and official capacities.

21.     Defendant AMY GRIER ("GRIER") is and was, at all times relevant, employed as an Associate Director in the Human Resources Department at the University of Michigan. She is an Associate Director in the Human Resources Department at the University of Michigan. Defendant GRIER initiated and participated in the issuance of Plaintiffs' adverse employment actions and employment grievance review processes. She is sued in her individual and official capacities.

## IV.   COMMON FACTS

22.     The University of Michigan ("UM" or the "University") is a public university with campuses in Ann Arbor, Dearborn, and Flint, Michigan.

23.     The University of Michigan is a public employer with thousands of employees at campus and educational locations in Ann Arbor, Dearborn, Detroit,

and Flint and health facilities at more than two dozen locations around the state and in Ohio.

24.    The University is governed by a Board of Regents comprised of eight voting members plus the University President, who is an ex officio member of the Board. The Board of Regents has general supervisory powers over the University and its officers, and controls and directs all the institution's expenditures. The Board of Regents is also responsible for selecting the President of the University.

25.    As of October 2024, Plaintiff HAKIM was employed as a full-time Academic Program Specialist in the University of Michigan's Center for South Asian Studies ("CSAS") that is housed within the College of Literature, Science, and the Arts's International Institute.

26.    As an Academic Program Specialist, Plaintiff HAKIM planned CSAS events, lectures, programs, and conferences. Plaintiff HAKIM also coordinated and led CSAS academic programs for students and managed the CSAS budget and CSAS grants.

27.    As of January 2025, Plaintiff MACKEEN-SHAPIRO was employed as a student Program Assistant at the English Language Institute.

28.    As a Program Assistant, Plaintiff MACKEEN-SHAPIRO provided feedback and advice to international graduate students on their coursework and other academic materials to improve their English writing and verbal skills.

29.     As of August 2023, Plaintiff EAMAN ALI was employed as a Campus Information Assistant at the University's Campus Information Center.

30.     In her role as a Campus Information Assistant, Plaintiff ALI provided in-person customer service at the University Unions.

31.     Plaintiff ASSMAA EIDY was employed as a research assistant in the American Culture Department with Professor Umayyah Cable as of January 2025 and as a Community Leadership Fellow at the University's Ginsberg Center as of September 2024.

32.     As a research assistant, Plaintiff EIDY conducted research on Arab American social issues, archived primary sources, and assisted Professor Cable on a documentary film project.

33.     As a Community Leadership Fellow, Plaintiff EIDY conducted a public service project on behalf of the University with a local non-profit organization.

34.     In August 2024, Plaintiff HARRISON RHOADES was hired part-time as a Coalition Manager within the University of Michigan's Sustainable Food Program ("UMSFP"). UMSFP is a part of the Student Life Sustainability Office.

35.     As a Coalition Manager, Plaintiff RHOADES conducted a variety of work, including event planning and coordination, communication, and collaboration with partner organizations, and supporting a grant program coordinated by UMSFP.

36.     Throughout her time as a student, Plaintiff HASSABALLA has worked several part-time roles at the University, including serving as an undergraduate research assistant, a student life facilitator for M-STEM Academics, an Arab Heritage Month Student Coordinator, and a Teacher's Assistant at the North Campus Children's Center.

37.     Plaintiff HASSABALLA's most recent campus position was her employment as a Teacher's Assistant at the North Campus Children's Center from July 2022-November 2023.

38.     As a Teacher's Assistant, Plaintiff HASSABALLA supported the learning of children, especially bilingual children, and provided supervision and childcare to approximately dozens of students.

39.     In late August 2023, Plaintiff HASSABALLA injured her foot so severely that she could not move without the assistance of a scooter.

40.     On November 6, 2023, Plaintiff HASSABALLA ended her employment with the North Campus Children's Center due to her foot injury because she could not continue to move around and care for the children as her position required.

41.     Plaintiff CHAPPELL was employed part-time as a Student Building Manager at the Michigan League from August 2023-August 2024.

11

42.    Plaintiff CHAPPELL managed and prepared rooms at the Michigan League for events such as student organization meetings, conferences, and weddings.

43.    Plaintiff ELKOLALY was employed in several part-time roles at the University, including as an administrative assistant at Michigan Medicine, and a research assistant and Diversity Equity and Inclusion Officer in the Nuclear Engineering and Radiological Sciences Department.

44.    Plaintiff ELKOLALY was employed as a research assistant in the Nuclear Engineering and Radiological Sciences Department from September 2022-April 2024. Plaintiff ELKOLALY conducted research on nuclear energy.

45.    Each of the Plaintiffs was a dedicated University employee who took their job duties seriously, conducted exemplary work, and performed necessary services for the University.

46.    Each of the Plaintiffs was a University student at the time that they participated in the speech and advocacy activity that resulted in the Defendants later claimed was the basis of the employment retaliation and discrimination taken against them.

**UM Employees Regularly Speak on Issues of Public Concern**

47.     University students[1] regularly speak out as citizens on issues of public concern.

48.     The University's student employees also dedicate time outside of work to speak out on a variety of issues of public concern, including but not limited to, the Vietnam War, the Civil Rights Movement, climate change, racial justice, reproductive justice, workers' rights, and Israel-Palestine.

49.     For decades, students[2] have advocated on campus, at demonstrations, rallies, teach-ins, marches, strikes, sit-ins, pickets, and educational events for many important social and political issues.

50.     University students frequently call on the University, the City of Ann Arbor, the State of Michigan, and the federal government to act on a variety of issues of public concern.

51.     Employees participate in these activities outside of their work time at the University and outside of their capacity as University employees.

---

[1] Likewise University alumni, employees, faculty, administrators and other members of the University community also regularly speak out on issues of public concern.

[2] University alumni, employees, faculty, administrators and other members of the University community also regularly engage in these forms of advocacy on issues of public concern.

52.     In fact, the University has encouraged its students and employees to speak out on a variety of issues of public concern.

53.     Today, the University of Michigan commemorates the campus' long history of demonstrations, rallies, teach-ins, marches, strikes, sit-ins, pickets, and educational events in its classrooms, academic buildings, alumni magazines, websites, and symposiums and events.

54.     University administrators express their admiration for the University of Michigan's long history of activism by students — in brochures directed to prospective students, on murals on campus buildings, in classroom instruction, in social media posts, and through emails to the entire University network.

55.     The University's own *Free Speech on Campus* webpage reflects the University's policies and practices, stating that the University "has long welcomed dissent, advocacy, and the expression of the broadest array of ideas, even those that could be unpopular, upsetting or critical of the university."[3]

56.     Dating back to the civil rights movement and Vietnam War era, the University is believed to have maintained a consistent policy and practice of not bringing disciplinary proceedings or other actions against students who advocate on issues of public concern.

---

[3] *See* https://publicaffairs.vpcomm.umich.edu/key-issues/free-speech-on-campus/.

14

57.     Sit-ins at the President's office have long been a common, recognized, and acceptable form of protest and method of demonstration at the University for decades.

58.     The President's office is in the Alexander G. Ruthven Building ("Ruthven Building").

59.     The building is open to the public and accessible to students via University-issued access cards.

60.     Student sit-ins at the Ruthven Building typically seek to get the attention of the University's President or the President's representative and to communicate a message to, petition them to make changes to the University, or make a request of them.

61.     Until the incidents related herein, sit-ins in the Ruthven Building have not resulted in the administration closing the building, locking the building's doors, or barring entry to students and the public.

62.      Until the incidents related herein, sit-ins in the Ruthven Building have not resulted in the administration calling outside police or ten different police agencies to respond, close the building, and remove students.

63.     Until the incidents related herein, sit-ins in the Ruthven Building have not resulted in the administration initiating disciplinary proceedings against participating students or issuing notices barring students from entering University

buildings and/or entering any part of the school's three campuses for a year or more.

64.     Until the incidents related herein, sit-ins in the Ruthven Building have not resulted in the administration **terminating the employment of students who had obtained on-campus work or terminating the work of recent graduates hired by the university as alumni**.

65.     Until the incidents related herein, sit-ins in the Ruthven Building have not resulted in the administration **forever barring students from any future work with any unit of the University system at all locations**.

66.     Likewise, innumerable protests and marches have occurred on the sidewalks of the campus and in the public areas outside of campus buildings.

67.     Historically, protests and marches occurring on the campus' public sidewalks or public areas outside of campus building have not resulted in the administration initiating disciplinary proceedings against participating students; issuing notices barring students from entering University buildings and/or entering any part of the school's three campuses for a year or more; terminating the employment of participating students; or forever barring students from any future work with any unit of the University system at all locations.

68.     Divestment campaigns are one example of a successful and important form of student advocacy at the University of Michigan.

69.     Students led a powerful movement calling upon the University to divest

its financial holdings from apartheid South Africa. For decades, the UM student movement against apartheid leveraged demonstrations, marches, sit-ins, and campaigns to educate and push the University administration, Board of Regents, and state officials to divest from South Africa.

70.     After years of protest the University's Board of Regents passed its first resolution to divest from South Africa in the late 1970s.

71.     Students led other campaigns calling upon the University to divest on other issues of public concern.

72.     In 2000, the University divested from tobacco companies.

73.     In 2002, the University began the process of divesting from fossil fuels.

74.     In 2022, the University divested from Russia.

75.     Each of the divestment actions followed advocacy, demonstrations, and other protest activity by students.

### Methods of Divestment Advocacy Have Not Changed, But The University's Response Has Changed Dramatically When Students Advocate for Divestment from Israel

76.     Groups advocating both in support of Palestinian rights and in support of Israel have long existed on the University of Michigan's campus.

77.     For decades, there has been a movement of students advocating for the human rights of Palestinians and calling for the University's divestment.

78.     Students regularly participate in demonstrations, sit-ins, protests,

marches, strikes, and other methods of advocacy to speak out for the human rights of Palestinians and for the University to divest from Israel and from companies complicit in violating the human rights of Palestinians.

79.    The methods of advocacy used by the divestment movement at the University of Michigan – including peaceful demonstrations, sit-ins, vigils, and educational programming – have remained consistent over time.

80.    Since October 7, 2023, student activities on campus – both in support of and in opposition to Israel's actions in Gaza – have dramatically increased.

81.    These activities have included marches, vigils, sit-ins, and other educational events and expressive activities by students.

82.    Since October 7, 2023, the University's response to pro-Palestine and pro-divestment speech and protest activities by students has changed dramatically.

83.    Since October 7, 2023, the University has solely targeted, discriminated against, and punished students for engaging in speech and protest activity in support of Palestine and calling for the University to divest from Israel as a means of pressuring Israel to cease human rights violations against the Palestinian people, including crimes against humanity and genocide.

84.    Defendants have targeted students, including the Plaintiffs, and are seeking to make examples of them to deter others from expressing viewpoints that Defendants view as pro-Palestinian and to deter others from engaging in similar

speech and activities.

85.    In so doing, Defendants have taken a range of punitive measures, including retaining outside consultants to bring complaints; initiating disciplinary proceedings against individuals; initiating disciplinary proceedings against student organizations; summarily issuing trespass notice punishments; terminating students' employment; terminating alumni's employment; and barring students and alumni from any future employment across the entire University system.

86.    During the previous half century, no such measures are known to have been taken at any time by the University against students or alumni who, while students, had engaged in speech and related activities on other important issues of public concern,

87.    During the previous half century, no such measures are known to have been taken at any time by the University against students or alumni with opposing viewpoints on the same issues of public concern, including but not limited to students advocating Pro-Israeli viewpoints.

88.    Defendants are targeting students, including Plaintiffs, through selective enforcement and weaponization of established policies, procedures, and practices to silence viewpoints advocating for the human rights of Palestinians and for divestment from Israel and from companies complicit in violating the human rights of Palestinians.

89.     Defendants have wrongfully determined that speech and expressive activity in support of the human rights of Palestinians; advocating for recognition of a genocide in Gaza by the Israeli government; calling for the University to divest from Israel; calling for divestment from companies alleged to be complicit in violating the human rights of Palestinians; opposing business or school as usual during a genocide; opposing Zionism; and related language expressing similar viewpoints on an issue of public concern to constitute violence or a threat of violence in violation of University policies.

90.     As a result of the Defendants' determination, the Defendants have sought to punish employees, including the Plaintiffs, for engaging in pure protected speech and expressive activities as violative of the University's polices against violence.

91.     University officials, including the Defendants, have never defined speech and expressive activity by others that espouse opposing viewpoints, such as support of Israeli policies in Gaza, or by persons on other issues of public concern, as constituting violence or a threat of violence in violation of University policies.

92.     University officials, including the Defendants, have never taken such measures against others that espouse opposing viewpoints, such as support of Israeli policies in Gaza, or by persons on other issues of public concern.

20

### Plaintiffs HASSABALLA, CHAPPELL, and ELKOLALY Attended a Peaceful Sit-In to Call for Divestment from Israel

93.     On November 17th, 2023, students entered the Ruthven Building to hold a sit-in.

94.     The sit-in was to be held during normal business hours in the public lobby of the President's office and other public areas of the Ruthven Building and was held on Friday afternoon to minimize disruption of University activities within the offices in the building.

95.     The sit-in sought to highlight the need for divestment to help stop a genocide against the Palestinian people and participants sought to call on Defendant ONO to meet and meaningfully discuss divestment from Israel and from companies complicit in violating the human rights of Palestinians.

96.     Over the course of decades at the University, countless students have held sit-ins and other expressive demonstrations at this very location—in the lobby of the President's office and the common areas of the Ruthven Building—to demand that University administration engage in meaningful dialogue on various issues of public interest.

97.     Students have long had access to the Ruthven Building and University access cards have allow them to freely enter the building throughout the day.

98.     In fact, an almost identical sit-in at this same location occurred a few weeks prior to November 17, 2023.

99.     The earlier sit-in resulted in students speaking to a University administrator who promised to follow-up on requests for a meeting to discuss divestment.

100.    Students returned on November 17 to reiterate their prior requests when no meeting was forthcoming.

101.    On that day, students marched from the Diag before arriving at the Ruthven Building.

102.    Upon arrival, students entered the Ruthven Building, sat in a circle, and sang peace songs.

103.    In an unprecedented break from its previous policies and practices, University administrators called in police from over ten different law enforcement departments to close the building and remove the students.

104.    As a result, forty-two students were arrested — all for minor charges of failing to leave the building when first ordered to do so.

105.    Students given written citations by police officers at the building and were then allowed to leave, without further incident.

106.    None of the students engaged in acts of violence or sought to harm any police officers, University employees, or others and none sought to destroy or damage any school property.

107.    Several students were, however, injured by overly aggressive police

tactics.

108.   Plaintiff ZAYNAB ELKOLALY attended the sit-in at the Ruthven Building on November 17, 2023.

109.   While attempting to enter the building, which she believed was still open to the public, Plaintiff ELKOLALY became caught between a crowd of persons trying to enter the building and police officers standing in the entryway. While turned away from the entrance to leave and with her back to the police, she was grabbed from behind and thrown to the ground by a University of Michigan police officer. While being thrown to the ground, her hijab was ripped off.

110.   She was then assisted to her feet by another officer who directed her to stand next to him, which she did.

111.   She remained standing next to the police officer while he engaged with other persons who were attempting to enter the building.

112.   After standing next to the officer for several minutes, the officer told her that she could go ahead and join the other students who were engaged in the sit-in. She joined her peers singing songs and chanting for Defendant ONO to meet with students.

113.   Plaintiff RHEA CHAPPELL attended the sit-in at the Ruthven Building on November 17, 2023. She also sat in a circle and sang songs outside of Defendant ONO's office.

114.   Plaintiffs ELKOLALY and CHAPPELL attended the sit-in outside of their regular work hours and the sit-in did not impact on their work responsibilities in any manner.

115.   Plaintiff ARWA HASSABALLA also attended the sit-in at the Ruthven Building on November 17, 2023. Plaintiff HASSABALLA chanted alongside fellow students calling for the freedom and liberation of Palestine.

116.   Plaintiff HASSABALLA had already asked her employer to remove her from the schedule due to a foot injury. Plaintiff HASSABALLA was therefore not working at all at the time of the November 17 demonstration.

## The University Of Michigan Retaliates Against
## Plaintiffs HASSABALLA, CHAPPELL, And ELKOLALY

117.   As a result of attending the November 17, 2023 sit-in at the Ruthven Building, Plaintiffs ELKOLALY, HASSABALLA, and CHAPPELL were all targeted by Mr. Omar Torres – a consultant for the University hired to bring a student disciplinary complaint against them for alleged violations of the *Statement of Student Rights and Responsibility* ("*Statement*").

118.   Each had a complaint filed against them by Mr. Torres through the university's student disciplinary procedures.

119.   Within the complaint against Plaintiffs, Mr. Torres alleged the following violations of the *Statement*:

- N. Obstructing or disrupting classes, research projects, or other

24

activities or programs of the University; or obstructing access to university facilities, property, or programs (except for behavior that is protected by the University's policy on Freedom of Speech and Artistic Expression).

- Q. Failing to comply with lawful requests to leave a University controlled premises.

120. During the student disciplinary hearings, administrators departed from and committed numerous violations of established University policies, practices, including but not limited to:

a. Hiring outside consultants to bring a complaint against students;[4]

b. The University itself initiated a complaint despite being barred from doing so:[5]

c. Denying recognized dispute resolution options to the students;

d. Rejecting the student hearing panel's and appeals board's findings that the students had not violated the Statement and recommending that the complaint be dismissed;

e. Upon appeal, changing the presumption of innocence, shifting the burden of production and proof from being on the complainant to prove their allegations to being on the students to prove their innocence of any allegations made against them; and

f. Upon appeal, finding that students' silence and choosing not to testify could be found to be evidence of their guilt.

---

[4] This is unprecedented and has never been known to have occurred at the University.

[5] Complaints must be brought by fellow students, staff, faculty, or other employees of the University.

25

121.   The University's disciplinary actions against Plaintiffs ELKOLALY, HASSABALLA, and CHAPPELL, among other students who participated in a collective hearing, were clearly taken in violation of their First Amendment, Due Process, and Equal Protection rights and is the subject of other ongoing litigation.

122.   Nine (9) months after the sit-in at the Ruthven Building, Plaintiff **ARWA HASSABALLA** received a letter from the University Human Resources ("University HR").

123.   The letter stated that Plaintiff HASSABALLA was "ineligible for rehire" at the University and that her "record will reflect that she violated the Violence in the University Community SPG 601.18."

124.   Defendant GRIER signed the letter.

125.   At the time this letter was sent, Plaintiff HASSABALLA was no longer a student at the University nor was she employed by the University.

126.   Plaintiff HASSABALLA planned to apply for post-graduate employment at the University of Michigan. She also planned to apply for graduate school at the University in the future.

127.   If her applications were accepted, Plaintiff HASSABALLA planned to work on an on-campus job again as a graduate student.

128.   On August 31, 2024, Plaintiff HASSABALLA made a formal request to Defendant GRIER to commence a grievance process to appeal University HR's

determination that she violated the University's SPG 601.18.

129.   On October 22, 2024, Plaintiff HASSABALLA received the evidence that University HR allegedly used to determine the adverse employment actions taken against her.

130.   She received two pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report and (2) an incident report that allegedly provided a review of her conduct. The incident report was entirely based on the DPSS report.

131.   On November 5, 2024, Plaintiff HASSABALLA had a Grievance Hearing before a University Grievance Review Committee comprised of University staff members

132.   The hearing was coordinated by Defendant GRIER.

133.   During the hearing, a University representative attempted to introduce hearsay by claiming that video evidence showed that Plaintiff HASSABALLA had violated the Violence in the University Policy at the Ruthven protest.

134.   The representative did not seek to introduce or show the video at the hearing but acknowledged that it existed.

135.   Plaintiff HASSABALLA was not provided with the alleged video evidence prior to or during the Grievance Hearing.

136.   Grievance Committee members stated that they also had not been

provided the alleged video evidence and had not seen it at the time of the Grievance Hearing.

137.   At the hearing, there was no evidence or testimony from any witness who observed the Plaintiffs HASSABALLA engaging in an act of violence or otherwise violating SPG 601.18 during the sit-in at the Ruthven Building.

138.   Several days later, Plaintiff HASSABALLA received a message from Defendant GRIER that the University Grievance Review Committee had reviewed the alleged video with unknown persons at some unknown time and place after the hearing.

139.   On November 14, 2024, Plaintiff HASSABALLA received an email from Defendant CHATAS stating that "your case has been escalated to me for final review and determination."[6]

140.   Defendant CHATAS upheld the University's decision to terminate Plaintiff HASSABALLA and render her permanently ineligible for rehire at the University.

141.   On November 22, 2024, Plaintiff HASSABALLA was finally allowed to watch the video that was provided to the Grievance Review Committee after her

---

[6] Per the University's SPG 201.01, a case can only be escalated to the appropriate Executive Officer when one or more members of the committee do not agree with the grievance answer proposed by the operating unit.

hearing and which appears to have been the sole basis of the University's adverse employment action taken against her.

142.    At that time, Plaintiff HASSABALLA was able to view two videos: (1) showing a crowd of protesters outside of the Ruthven Building and (2) showing protesters walking through the building doors.

143.    In the first video, Plaintiff HASSABALLA can be seen walking into the Ruthven Building without issue and without encountering any police officers.

144.    Plaintiff HASSABALLA does not appear at all in the second video.

145.    The videos do not show that Plaintiff HASSABALLA committed any intentional acts of violence.

146.    Plaintiff HASSABALLA was not provided with a copy of these videos during or after November 22 meeting to view the videos.

147.    The Grievance Review Process was perfunctory, and the outcome was predetermined by the University to punish Plaintiff HASSABALLA for her exercise of her First Amendment rights.

148.    Plaintiff HASSABALLA served as a volunteer researcher at the University of Michigan's Institute for Social Research.

149.    Plaintiff HASSABALLA continued this volunteer research after her graduation.

150.    On April 16, 2025, Plaintiff HASSABALLA's supervisor informed her

that the Department was contacted by University Human Resources ("HR") who informed the Department that Plaintiff HASSABALLA's could no longer participate in volunteer work.

151.    On August 14, 2024, Plaintiff **RHEA CHAPPELL** received an email from Defendant GRIER stating that "a review of your conduct during the November 17, 2023 protest at the Alexander G. Ruthven building appears to show that you violated university policy."

152.    At that time, Plaintiff CHAPPELL was working as a building manager at the University's Michigan League.

153.    In the email, Defendant GRIER stated that Plaintiff CHAPPELL would have to attend a meeting scheduled for August 15, 2024, to discuss her actions at the sit-in.

154.    Plaintiff CHAPPELL asked Defendant GRIER who had provided the information about the November 17, 2023 sit-in to Human Resources.

155.    Defendant GRIER responded via email stating that "the information I have was provided through the U-M Office of General Counsel."

156.    Defendant GRIER's email also stated that the meeting would concern Plaintiff CHAPPELL's "status as a temporary employee and any outcomes of this meeting will apply to your status as an employee."

157.    On August 15, 2024, Plaintiff CHAPPELL met with Defendant

GRIER.

158.   At the meeting, Defendant GRIER informed Plaintiff CHAPPELL that she would be placed on unpaid suspension pending an outcome of the assessment that she violated SPG 601.18, Violence in the University Community.

159.   Later that day, Plaintiff CHAPPELL received notification from her employer that, due to the decision of University HR to suspend her without pay, she was not authorized to attend the Department's scheduling meeting and that she would not be scheduled for shifts in September.

160.   On August 16, 2024, Plaintiff CHAPPELL emailed Defendant GRIER and denied engaging in any act of violence at the November 17, 2023 sit-in.

161.   On August 20, 2024 – 9 months after the sit-in at the Ruthven Building – Plaintiff CHAPPELL received an email from Defendant GRIER stating that "the assessment of the allegation that you violated the Violence in the University Community SPG is completed."

162.   On August 22, 2024, Plaintiff CHAPPELL met with Defendant GRIER and was informed that University HR made the decision to terminate her employment, effective August 22, 2024, and that she was permanently ineligible for rehire at the University.

163.   Plaintiff CHAPPELL was told that this decision was made due to the University's determination that she violated SPG 601.18.

164.   Plaintiff CHAPPELL subsequently received a formal letter from University HR confirming what she had been told. Defendant GRIER signed the letter.

165.   On September 3, 2024, Plaintiff CHAPPELL made a formal request to Defendant GRIER to commence a grievance process to appeal University HR's determination.

166.   On October 24, 2024, Plaintiff CHAPPELL received the evidence that University HR allegedly used to make its determination.

167.   Plaintiff CHAPPELL received two pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report and (2) an incident report that allegedly provided a review of her conduct. The incident report was based on the DPSS report.

168.   On November 4, 2024, Plaintiff CHAPPELL had a Grievance Hearing before a University Grievance Review Committee.

169.   The hearing was coordinated by Defendant GRIER.

170.   During the Grievance Hearing, a representative from the University attempted to give hearsay testimony stating that there was video evidence showing that Plaintiff CHAPPELL had violated the Violence in the University Policy.

171.   Plaintiff CHAPPELL was not provided with or able to see the alleged video evidence prior to or during the Grievance Hearing.

172.   At the hearing members of the Grievance Committee stated that they also had not been provided with or had seen the alleged video evidence.

173.   At the hearing, there was no evidence or testimony from any witness who observed the Plaintiffs CHAPPELL engaging in an act of violence or otherwise violating SPG 601.18.

174.   On November 11, 2024, several days after Plaintiff CHAPPELL's Grievance Hearing, she received a message from Defendant GRIER that the University Grievance Review Committee had reviewed the alleged video footage at an unknown time and place with unknown persons present.

175.   On November 14, 2024, Plaintiff CHAPPELL received an email from Defendant CHATAS that stated that "your case has been escalated to me for final review and determination."

176.   Defendant CHATAS upheld the University's decision to terminate Plaintiff CHAPPEL and render her permanently ineligible for rehire at the University.

177.   On November 22, 2024, Plaintiff CHAPPELL was finally allowed to see the video evidence that the Grievance Review Committee allegedly reviewed after her Grievance Review Committee Hearing, and which was the sole basis for the adverse employment action that was taken against her.

178.   Plaintiff CHAPPELL was able to view two videos: (1) showing a crowd

of protesters outside of the Ruthven Building and (2) showing protesters walking through the building doors.

179.   In the first video, Plaintiff CHAPPELL can be seen walking in front of an officer, into the Ruthven Building. The video does not show Plaintiff CHAPPELL making any physical contact with or pushing into an officer.

180.   The second video showed that Plaintiff CHAPPELL walked in front of an officer and did not have any contact or confrontation with the officer.

181.   The videos do not show that Plaintiff CHAPPELL committed any acts of violence.

182.   Plaintiff CHAPPEL was not provided with a copy of these videos during or after the November 22 meeting to view the videos.

183.   The Grievance Review Process was perfunctory, and the outcome was predetermined by the University to punish Plaintiff CHAPPELL for her exercise of her First Amendment rights.

184.   On September 16, 2024 – 10 months after the sit-in at the Ruthven Building, Plaintiff **ZAYNAB ELKOLALY** received an email from Defendant GRIER. that was inaccurately dated August 14.

185.   Defendant GRIER's email noted that "last month, I mailed a letter to you that .. was recently returned as undeliverable."

186.   The letter was to inform Plaintiff ELKOLALY that she was "ineligible

for rehire" at the University and that her "record will reflect that she violated the Violence in the University SPG 601.18."

187.   At the time she received the email from Defendant GRIER, Plaintiff ELKOLALY was no longer a student at the University nor was she employed by the University.

188.   Plaintiff ELKOLALY planned to apply for post-graduate employment at the University of Michigan.

189.   She also planned to apply for graduate school at the University in the future, and if accepted, planned to work on an on-campus job again as a graduate student.

190.   Plaintiff ELKOLALY made a formal request to Defendant GRIER to commence a grievance process to appeal University HR's determination that she violated SPG 601.18.

191.   On October 16, 2024, Plaintiff ELKOLALY received the evidence that University HR allegedly used to make its determination.

192.   Plaintiff ELKOLALY received two pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report and (2) an incident report that allegedly provided a review of her conduct. The incident report was based on the DPSS report.

193.   On November 5, 2024, Plaintiff ELKOLALY had a Grievance Hearing

before a University Grievance Review Committee that was coordinated by Defendant GRIER and comprised of University staff members.

194.   During the Grievance Hearing, a representative from the University again sought to introduce hearsay testimony that video evidence showed that Plaintiff ELKOLALY had violated the Violence in the University Policy.

195.   Again, Plaintiff ELKOLALY and the Grievance Committee members were not provided with the video and were not allowed to see it before or at the hearing.

196.   At the hearing and like the other Plaintiffs, there was no evidence or testimony from any witness who observed the Plaintiff ELKOLALY engaging in an act of violence or otherwise violating SPG 601.18.

197.   Several days after Plaintiff ELKOLALY's Grievance Hearing, she received a message from Defendant GRIER that the University Grievance Review Committee had reviewed the alleged video footage.

198.   On November 14, 2024, Plaintiff ELKOLALY received an email from Defendant CHATAS stating "your case has been escalated to me for final review and determination."

199.   Defendant CHATAS again upheld the University's decision to terminate Plaintiff ELKOLALY and render her permanently ineligible for rehire at the University.

36

200.   On December 12, 2024, Plaintiff ELKOLALY was allowed to watch the video evidence that was the basis for the adverse employment action taken against her.

201.   Plaintiff ELKOLALY was able to view two videos: (1) showing a crowd of protesters outside of the Ruthven Building and (2) showing protesters walking through the building doors.

202.   In the footage, University of Michigan Division of Public Safety and Security ("DPSS") Office DeRitter can be seen running across the rotunda of the Ruthven Building towards Plaintiff ELKOLALY.

203.   Officer DeRitter is seen grabbing Plaintiff ELKOLALY after she turns away from him.

204.   Officer DeRitter is seen throwing Plaintiff ELKOLALY to the ground as she screams. Plaintiff ELKOLALY's hijab can be seen being ripped from her head at that time.

205.   The video does not show that Plaintiff ELKOLALY committed any acts of violence.

206.   Plaintiff ELKOLALY was not provided with a copy of these videos during or after the December 12 meeting to view the videos.

207.   The Grievance Review Process was perfunctory, and the outcome was predetermined by the University to punish Plaintiff ELKOLALY for her exercise of

free speech.

208.   Before the actions taken against the Plaintiffs, Defendants have never terminated the employment or barred the future employment of students or alumni because of speech or other activities occurring during an on-campus sit-in.

209.   Before the actions taken against the Plaintiffs, Defendants have never found the same or similar speech and/or activity engaged in by the Plaintiffs to constitute violence or a threat of violence in violation of University policies when, during an on-campus sit-in, engaged in by students on other issues or when expressing viewpoints opposed to those of the Plaintiffs.

### Plaintiffs HAKIM, MACKEEN-SHAPIRO, ALI, RHOADES, And EIDY Attended a Peaceful Protest Outside the University's Art Museum

210.   On May 3, 2024, students held an impromptu protest outside of the University of Michigan Museum of Art ("UMMA") in order speak out against an ongoing genocide in Gaza and call on the Regents to divest from Israel.

211.   Several Regents of the University of Michigan were attending a private event held in the public UMMA building.

212.   Protesters stood in front of the UMMA, linked arms, and chanted.

213.   University of Michigan police arrived and set up a barricade surrounding the entrance to the UMMA.

214.   Protesters moved back for the barricade to be set up and remained behind the barricade.

38

215.  At the time of the UMMA protest, Plaintiffs HAKIM, MACKEEN-SHAPIRO, ALI, EIDY, AND RHOADES were undergraduate students at the University of Michigan.

216.  At the time of the UMMA protest, Plaintiffs HAKIM, MACKEEN-SHAPIRO, EIDY, and RHOADES were not employees at the University.

217.  At the time of the UMMA protest, Plaintiff ALI was employed as a Campus Information Assistant.

218.  Plaintiffs HAKIM, MACKEEN-SHAPIRO, ALI, EIDY, AND RHOADES attended the UMMA protest and complied with orders from police, stood on the public sidewalk behind the barricade, and chanted for a free Palestine and called on their University Regents to divest from Israel.

219.  University of Michigan police sought to disburse the peaceful protesters who were on a public sidewalk by using pepper spray, pushing protesters with bikes, and physically assaulting individuals.

### The University of Michigan Retaliates Against
### Plaintiffs HAKIM, MACKEEN-SHAPIRO, ALI, RHOADES, and EIDY

214.  On April 7, 2025, eleven months after the UMMA protest, Plaintiff **ZAINAB HAKIM** received an email from Defendant GRIER stating that "a review of your conduct during the May 3, 2024 protest at the University of Michigan Museum of Art building appears to show that you violated university policy. As a result, you are being placed on paid suspension effective

39

immediately."

215.   Attached to the April 7 email, Plaintiff HAKIM received the evidence that University HR used to determine her adverse employment action.

216.   Plaintiff HAKIM received two pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report and (2) a video comprised of a collection of police body camera footage.

217.   The videos do not show Plaintiff HAKIM engaging in any violent conduct.

218.   The videos show Plaintiff HAKIM exercising her First Amendment rights, peacefully linking arms with fellow protesters, and chanting.

219.   The videos also show Plaintiff HAKIM standing on the sidewalk and complying with police orders when officers erected the barricade.

220.   On April 7, 2025, at the time that she received the letter from Defendant GRIER, Plaintiff HAKIM was working as an Academic Program Specialist at the University's Center for South Asian Studies.

221.   In the April 7 email, Defendant GRIER stated that Plaintiff HAKIM could schedule a meeting with Ms. Grier to respond to the policy violation alleged.

222.   A meeting was scheduled for April 11, 2025.

223.   On April 8, 2025, the University Staff United, an affiliate of the

American Federation of Teachers-Michigan ("USU AFT-MI") – the union representing Plaintiff HAKIM – issued a bargaining demand under Michigan's Public Employment Relations Act of 1947 ("PERA") challenging the decision to impose discipline on Plaintiff HAKIM, the extent of the discipline imposed, and the practice or policy of imposing discipline for incidents allegedly occurring prior to employment.

224.   The University refused to bargain with USU AFT-MI and instead proceeded with the disciplinary process against Plaintiff HAKIM.

225.   In an email sent on April 10, 2025, Plaintiff HAKIM asked to bring a union representative, attorney, and her supervisor to the meeting with Ms. Grier.

226.   Defendant GRIER denied Plaintiff HAKIM's request.

227.   During the April 11, 2025 meeting, Plaintiff HAKIM responded to Defendant GRIER and strongly disputed the claims that she was violent in any way at the May 3, 2024 demonstration.

228.   Following the meeting, Defendant GRIER sent Plaintiff HAKIM an email informing her that she had been terminated from her full-time position at the University.

229.   Plaintiff HAKIM subsequently received a formal letter from University HR confirming the termination and stating that "[y]ou are ineligible for rehire at the University and your record will reflect that you violated the Violence in the

University SPG 601.18." The letter was signed by Defendant GRIER.

230.   On April 14, 2025, USU AFT-MI filed an Unfair Labor Practice Charge with the Michigan Department of Labor and Economic Opportunity citing the University's failure to bargain over Plaintiff HAKIM's discipline and termination.

231.   On April 7, 2025, eleven months after the UMMA protest, Plaintiff **HENRY MACKEEN-SHAPIRO** received an email from Defendant GRIER stating that "a review of your conduct during the May 3, 2024 protest at the University of Michigan Museum of Art building appears to show that you violated university policy. As a result, you are being placed on paid suspension effective immediately."

232.   Attached to the April 7 email, Plaintiff MACKEEN-SHAPIRO received the evidence that University HR allegedly used as the basis of the adverse employment action.

233.   Plaintiff MACKEEN-SHAPIRO received two pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report and (2) a collection of police body camera footage.

234.   The videos do not show Plaintiff MACKEEN-SHAPIRO engaging in any violent conduct.

235.   The videos show Plaintiff MACKEEN-SHAPIRO exercising his constitutional rights to free speech and expression as he peacefully chants, stands on

a public sidewalk, and links arms with his fellow protesters.

236.   The videos also show Plaintiff MACKEEN-SHAPIRO standing on the sidewalk, looking at the UMMA, and complying with police orders when officers erected the barricade.

237.   On April 7, 2025, at the time that he received the letter from Defendant GRIER, Plaintiff MACKEEN-SHAPIRO was working as a Program Assistant at the University's English Language Institute.

238.   Plaintiff MACKEEN-SHAPIRO is interested in pursuing a career in education and planned to apply for full-time employment at the University after his anticipated May 2025 graduation.

239.   In the April 7 email, Defendant GRIER stated that Plaintiff MACKEEN-SHAPIRO could schedule a meeting with Ms. Grier to respond to the policy violation alleged.

240.   A meeting was scheduled for April 16, 2025.

241.   On April 16, 2025, Plaintiff MACKEEN-SHAPIRO met with Defendant GRIER.

242.   In the April 16 meeting, Plaintiff MACKEEN-SHAPIRO responded to Defendant GRIER and strongly disputed the claims that he was violent in any way at the May 3, 2024 demonstration.

243.   Plaintiff MACKEEN-SHAPIRO asked Defendant GRIER what the

process was to appeal the University's decision once it was ultimately delivered to him.

244.   Defendant GRIER informed Plaintiff MACKEEN-SHAPRIO that an appeal would be futile because the University was aware that he participated in other protests, presumably with a similar viewpoint on the same issue.

245.   On April 16, 2025 – eleven months after the peaceful protest outside UMMA – Defendant GRIER sent Plaintiff MACKEEN-SHAPRIO an email informing him that he had been terminated from his position at the University.

246.   Plaintiff MACKEEN-SHAPRIO received a formal letter from University HR confirming the termination and stating that "[y]ou are ineligible for rehire at the University and your record will reflect that you violated the Violence in the University SPG 601.18." The letter was signed by Defendant GRIER.

247.   On April 7, 2025, eleven months after the UMMA protest, Plaintiff **EAMAN ALI** received an email from Defendant GRIER stating that "a review of your conduct during the May 3, 2024, protest at the University of Michigan Museum of Art building appears to show that you violated university policy. As a result, you are being placed on paid suspension effective immediately."

248.   Attached to the April 7 email, Plaintiff ALI received the evidence that University HR allegedly used to determine her adverse employment action.

249.   Plaintiff ALI received two pieces of evidence: (1) a heavily redacted

University of Michigan Department of Public Safety and Security ("DPSS") report and (2) a collection of videos.

250. The videos do not show Plaintiff ALI engaging in any violent conduct.

251. The videos show Plaintiff ALI exercising her First Amendment rights and linking arms with her fellow protesters.

252. The videos also show Plaintiff ALI standing on the sidewalk and complying with police orders when officers erected the barricade.

253. On April 7, 2025, at the time that she received the letter from Defendant GRIER, Plaintiff ALI was working as a Campus Information Assistant.

254. Plaintiff ALI was planning to continue her employment as long as she was a student at the University of Michigan.

255. Plaintiff ALI was interested in future employment opportunities within the University of Michigan system after her graduation from the University.

256. In the April 7 email, Defendant GRIER stated that Plaintiff ALI could schedule a meeting with Ms. Grier to respond to the policy violation alleged.

257. A meeting was scheduled for April 14, 2025.

258. On April 14, 2025, Plaintiff ALI and her attorney met with Defendant GRIER.

259. In the April 15 meeting, Plaintiff ALI responded to Defendant GRIER and strongly disputed the claims that she was violent in any way at the May 3, 2024

demonstration.

260.  On April 16, 2025 – eleven months after the peaceful protest outside UMMA – Defendant GRIER sent Plaintiff ALI an email informing her that she had been terminated from her position at the University.

261.  Plaintiff ALI received a formal letter from University HR confirming the termination and stating that "[y]ou are ineligible for rehire at the University and your record will reflect that you violated the Violence in the University SPG 601.18."." Defendant GRIER signed the letter.

262.  On April 7, 2025, eleven months after the UMMA protest, Plaintiff **HARRISON RHOADES** received an email from Defendant GRIER stating that "a review of your conduct during the May 3, 2024 protest at the University of Michigan Museum of Art building appears to show that you violated university policy. As a result, you are being placed on paid suspension effective immediately."

263.  Attached to the April 7 email, Plaintiff RHOADES received the evidence that University HR allegedly used to determine his adverse employment action.

264.  Plaintiff RHOADES received several pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report; (2) an incident report based solely on the DPSS report; and (3) a collection of videos.

265.   The videos do not show Plaintiff RHOADES engaging in any violent conduct.

266.   The videos show Plaintiff RHOADES exercising his First Amendment rights as he peacefully chants.

267.   The videos also show Plaintiff RHOADES respectfully complying with all police orders directed at him.

268.   On April 7, 2025, at the time that he received the letter from Defendant GRIER, Plaintiff RHOADES was working as Coalition Manager in the University's Sustainable Food Program.

269.   Plaintiff RHOADES was planning to continue his employment at the University.

270.   In the April 7 email, Defendant GRIER stated that Plaintiff RHOADES could schedule a meeting with Ms. Grier to respond to the policy violation alleged. A meeting was scheduled for April 14, 2025.

271.   On April 14, 2025, Plaintiff RHOADES met with Defendant GRIER.

272.   In the April 15 meeting, Plaintiff RHOADES responded to Defendant GRIER and strongly disputed the claims that he was violent in any way at the May 3, 2024 demonstration.

273.   On April 16, 2025 – eleven months after the peaceful protest outside UMMA – Defendant GRIER sent Plaintiff RHOADES an email informing him that

he had been terminated from his position at the University.

274.  Plaintiff RHOADES received a formal letter from University HR stating, confirming the termination and stating that "[y]ou are ineligible for rehire at the University and your record will reflect that you violated the Violence in the University SPG 601.18." Defendant GRIER signed the letter.

275.  On April 7, 2025, eleven months after the UMMA protest, **Plaintiff ASSMAA EIDY** received an email from Defendant GRIER stating that "a review of your conduct during the May 3, 2024 protest at the University of Michigan Museum of Art building appears to show that you violated university policy. As a result, you are being placed on paid suspension effective immediately."

276.  Attached to the April 7 email, Plaintiff EIDY received the evidence that University HR allegedly used to determine her adverse employment action.

277.  Plaintiff EIDY received two pieces of evidence: (1) a heavily redacted University of Michigan Department of Public Safety and Security ("DPSS") report and (2) a collection of videos.

278.  The videos do not show Plaintiff EIDY engaging in any violent conduct.

279.  The videos show Plaintiff EIDY exercising her First Amendment rights to free speech and expression as she links arms with her fellow protesters and peacefully chants for the Regents to listen to students and engage in meaningful

discussion to divest from Israel.

280.   The videos also show Plaintiff EIDY standing on the sidewalk and complying with police orders when officers erected the barricade.

281.   On April 7, 2025, at the time that she received the letter from Defendant GRIER, Plaintiff EIDY was working as both a research assistant and a Community Leadership Fellow at the University.

282.   Plaintiff EIDY was planning to continue her employment as long as she was a student at the University of Michigan.

283.   Plaintiff EIDY was interested in future employment opportunities within the University of Michigan system after her graduation from the University.

284.   In the April 7 email, Defendant GRIER stated that Plaintiff EIDY could schedule a meeting with Ms. Grier to respond to the policy violation alleged. A meeting was scheduled for April 14, 2025.

285.   On April 14, 2025, Plaintiff EIDY met with Defendant GRIER.

286.   In the April 15 meeting, Plaintiff EIDY responded to Defendant GRIER and strongly disputed the claims that she was violent in any way at the May 3, 2024 demonstration.

287.   On April 16, 2025 – eleven months after the peaceful protest outside UMMA – Defendant GRIER sent Plaintiff EIDY an email informing her that she had been terminated from her position at the University.

288.   Plaintiff EIDY received a formal letter from University HR confirming the termination and stating "[y]ou are ineligible for rehire at the University and your record will reflect that you violated the Violence in the University SPG 601.18." Defendant GRIER signed the letter.

289.   Before the actions taken against the Plaintiffs, Defendants have never terminated the employment or barred the future employment of students or alumni because of speech or other activities occurring during an on-campus protest.

290.   Before the actions taken against the Plaintiffs, Defendants have never found the same or similar speech and/or activity engaged in by the Plaintiffs to constitute violence or a threat of violence in violation of University policies when, during an on-campus protest, engaged in by students on other issues or when expressing viewpoints opposed to those of the Plaintiffs.

291.   None of the supervisors for or the departments staff that worked with Plaintiffs HAKIM, MACKEEN-SHAPIRO, ALI, EIDY, RHOADES, HASSABALLA, CHAPPELL, and ELKOLALY were informed in advance or aware of the adverse employment action taken against them by University Human Resources.

292.   Supervisors for the Plaintiffs were shocked and outraged by the University's actions to terminate and permanently bar the Plaintiffs from future employment at the University.

## V.    CAUSES OF ACTION

### COUNT I: First Amendment: Freedom of Speech
### 42 U.S.C. § 1983

293.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

294.   Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983.

295.   Acting under color of law, Defendants, in their respective individual and/or official capacities, engaged in conduct and adopted policies and practices that violate Plaintiffs' free speech rights under the First and Fourteenth Amendments of the U.S. Constitution.

296.   The free speech clause of the First Amendment states: "Congress shall make no law … abridging the freedom of speech."

297.   The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

298.   Under the Free Speech clause, state actors cannot retaliate or discriminate against persons because of the content of their speech, or the views expressed.[7]

299.   Under the Free Speech clause, Defendants cannot retaliate or

---

[7] The few exceptions to this prohibition are not presented in this case.

discriminate against public employees because of the content of their non-work speech, or the views expressed.

300.   Defendants' policies and practices violate constitutional protections for Free Speech by retaliating and discriminating against Plaintiffs because of the content of their speech and the viewpoints expressed by Plaintiffs.

301.   Plaintiffs engaged in constitutionally protected free speech.

302.   Defendants terminated Plaintiffs employment at the University based on the content of their speech and/or the viewpoints expressed.

303.   Defendants forever barred Plaintiffs from future employment within the University system based on the content of their speech and/or the viewpoints expressed.

304.   But for the content of Plaintiffs' speech and/or viewpoints expressed, Plaintiffs would not have been terminated from their employment with the University.

305.   But for the content of Plaintiffs' speech and/or viewpoints expressed, Plaintiffs would not have been barred from future employment with the University.

306.   As a direct and proximate result of the Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected rights to engage in free speech.

307.   Defendants' acts or omissions, and each of them, were a direct and

proximate cause of ongoing injuries and damages to the Plaintiffs.

308.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

309.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, and punitive damages Defendants ONO, CHATAS, HOLCOMB, and GRIER, in their personal capacities, together with costs, and attorney fees.

## COUNT II: First Amendment: Freedom of Association
## 42 U.S.C. § 1983

310.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

311.   Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983.

312.    Acting under color of law, Defendants, in their respective individual and/or official capacities, engaged in conduct and adopted policies that violate Plaintiffs' right to freedom of association under the First and Fourteenth Amendments of the U.S. Constitution.

313.   The Freedom of Association clause of the First Amendment states: "Congress shall make no law … prohibiting … or … abridging ... the right of the people peaceably to assemble."

314.   The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

315.   Under the freedom of association clause, Defendants cannot retaliate or discriminate against persons because they associate with one another to speak and express their viewpoints.

316.   Defendants' policies and practices violate constitutional protections for the freedom to associate by retaliating and discriminating against Plaintiffs because they came together and associated with one another to speak on a matter of public concern and to petition University officials.

317.   Plaintiffs associated with one another to amplify their voices on an issue of public concern and to petition the University.

318.   Defendants terminated Plaintiffs' employment based on their associating with each other to express a shared viewpoint and to petition the University to change its policies and practices on an issue of public concern.

319.   Defendants forever barred Plaintiffs from future employment with the University system based on their association with others who shared their viewpoints on an issue of public concern.

320.   But for their actions exercising their freedom to associate with others, Plaintiffs would not have been terminated from their employment with the

University.

321.   But for their actions exercising their freedom to associate with others, Plaintiffs would not have been barred from future employment with the University.

322.   As a direct and proximate result of the Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected rights to petition University officials.

323.   Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

324.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

325.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, and punitive damages against Defendants ONO, CHATAS, HOLCOMB, and GRIER, in their personal capacities, together with costs, and attorney fees.

## COUNT III: First Amendment: Right to Petition
## 42 U.S.C. § 1983

326.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

327.   Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983.

328.   Acting under color of law, Defendants, in their respective individual and/or official capacities, engaged in conduct and adopted policies that violate Plaintiffs' right to petition government under the First and Fourteenth Amendments of the U.S. Constitution.

329.   The Freedom to Petition clause of the First Amendment states: "Congress shall make no law … abridging the freedom …  to petition the Government for a redress of grievances."

330.   The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

331.   Under the petition clause, Defendants cannot retaliate or discriminate against persons because they sought to petition the government to redress a grievance or change a policy or practice on issues of public concern.

332.   Defendants' policies and practices violate constitutional protections for the right to petition the government by retaliating and discriminating against Plaintiffs because they sought for the University to change its policies and practices on an issue of public concern.

333.   Plaintiffs sought to petition University officials to change university polies and practices.

334.   Defendants   terminated   Plaintiffs'   employment   based   on   their

petitioning University officials to change University policies and practices on an issue of public concern.

335.   Defendants forever barred Plaintiffs from future employment with the University system based on their petitioning University officials to change University policies and practices on an issue of public concern.

336.   But for their actions exercising their right to petition University officials, Plaintiffs would not have been terminated from their employment with the University.

337.   But for their actions exercising their right to petition University officials, Plaintiffs would not have been barred from future employment with the University.

338.   As a direct and proximate result of the Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected rights to petition University officials.

339.   Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

340.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

341.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to

compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, and punitive damages against Defendants ONO, CHATAS, HOLCOMB, and GRIER, in their personal capacities, together with costs, and attorney fees.

### COUNT IV: Fourteenth Amendment Due Process (Deprivation of Property and/or Liberty Interest in Public Employment) 42 U.S.C. §1983

342.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

343.   Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983.

344.   Acting under color of law, Defendants, in their individual and/or official capacities, engaged in conduct and adopted policies that violate Plaintiffs' due process rights under Amend. XIV of the U.S. Constitution.

345.   The Due Process clause of Amendment XIV states, in pertinent part: "No state … shall any state deprive any person of … liberty, or property without due process of law."

346.   Under the Due Process clause, persons possess a property and/or liberty interest in their employment at a public university.

347.   Before the depriving Plaintiffs' of their employment, Defendants were required to provide an opportunity for a pre-deprivation hearing or alternatively, a meaningful post-deprivation hearing that complied with due process.

348.    The Due Process clause requires that state actors must provide persons notice of intended action; a full and fair opportunity to be heard; the opportunity to present and rebut evidence; and a fair and impartial decision maker.

349.    Plaintiffs were terminated from their public employment in a manner that fell far short of the constitutional requirements of due process.

350.    Plaintiffs were barred from future public employment at the University of Michigan in a manner that fell far short of the constitutional requirements of due process.

351.    Defendants' policies and practices, as stated above, violate the Due Process clause by denying students fair notice of adverse employment actions brought against them; denying students a fair opportunity to be heard prior to termination; by denying a fair opportunity know evidence, to present evidence and to rebut evidence introduced against them; by failing to provide a fair and impartial decision maker; and by failing to follow their own prescribed procedures.

352.    As a direct and proximate result of Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected due process rights.

353.    The Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

354.    As a result of the forgoing acts and omissions, Plaintiffs are entitled to

declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

355.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, and punitive damages against Defendants ONO, CHATAS, HOLCOMB, and GRIER, in their personal capacities, together with costs, and attorney fees.

### COUNT V: Fourteenth Amendment Due Process (Deprivation of Liberty Interest in Rights to Free Speech, Assembly, and Petition) 42 U.S.C. §1983

356.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

357.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

358.   Acting under color of law, Defendants, in their respective individual and/or official capacities, engaged in conduct and adopted policies that violate Plaintiffs' due process rights under Amend. XIV of the U.S. Constitution.

359.   The Due Process clause of Amendment XIV states, in pertinent part: "No state … shall any state deprive any person of … liberty … without due process of law."

360.   Under the Due Process clause, persons possess a liberty interest in their rights to free speech, association, and petition.

60

361. Before the depriving Plaintiffs' of their rights to free speech, association, and petition, Defendants were required to provide an opportunity for a pre-deprivation hearing or alternatively, a meaningful post-deprivation hearing that complied with due process.

362. The Due Process clause requires that state actors must provide persons notice of intended action; a full and fair opportunity to be heard; the opportunity to present and rebut evidence; and a fair and impartial decision maker.

363. Plaintiffs First Amendment rights were abridged in a manner that fell far short of the constitutional requirements of due process.

364. Defendants' policies and practices, as stated above, violate the Due Process clause by denying students fair notice of adverse employment actions brought against them; denying students a fair opportunity to be heard prior to termination; by denying a fair opportunity know evidence, to present evidence and to know and to rebut evidence introduced against them; by failing to provide a fair and impartial decision maker; and by failing to follow their own prescribed procedures.

365. As a direct and proximate result of Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected due process rights.

366.   The Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

367.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

368.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, and punitive damages against Defendants ONO, CHATAS, HOLCOMB, and GRIER, in their personal capacities, together with costs, and attorney fees.

## VI.   <u>JURY DEMAND</u>

347.   Plaintiffs demand a trial by jury in this matter.

## VII.   <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs, pray this Honorable court enter Judgment against Defendants providing:

a.   A declaration that Defendants, in the initiation and conduct of adverse employment action violated Plaintiffs' right to freedom of speech and expression by retaliating and discriminating against them because of the viewpoints Plaintiffs express;

b.   An injunction prohibiting the Defendants from initiating or conducting adverse employment actions against employees for engaging in activity protected by the First Amendment;

c.   An injunction ordering Defendants to repeal all adverse

employment actions taken against Plaintiffs and others similarly situated and reinstate all prior privileges and statues;

d.  Compensatory damages jointly and severally against the Defendants ONO, CHATAS, HOLCOMB, and GRIER in whatever amount is fair, just, and equitable for the injuries and damages sustained;

e.  Punitive damages against the Defendants ONO, CHATAS, HOLCOMB, and GRIER, in whatever amount is fair, just, and equitable to deter future conduct in violations of students' constitutional rights;

f.  Interest, costs, and attorney fees; and

g.  Further relief as is just and equitable.


Respectfully submitted,

/s/  John C. Philo
John C. Philo (P52721)
Liz Jacob (P86981)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
tparis@sugarlaw.org

/s/  Christopher Godshall-Bennett
Christopher Godshall-Bennett*
AMERICAN-ARAB ANTI-
DISCRIMINATION COMMITTEE
910 17th St. NW, Suite 1000
Washington, DC 20006
(202) 465-4247

cgb@adc.org
*Admission to the Eastern District of
Michigan Pending*

/s/  Ezra Ritchin
Ezra Ritchin (NY 6085054)
367 St. Marks Ave, #1132
Brooklyn, NY 11238
(917) 725-0116
ritchinezra@gmail.com


**Attorney for Plaintiffs**


Date: May 1, 2025